**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| WEEKS & IRVINE LLC, | ) | |
| | ) | |
| Plaintiff, | ) | No. 2:17-cv-02620-DCN |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| ASSOCIATED INDUSTRIES | ) | |
| INSURANCE COMPANY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on defendant Associated Industries Insurance Company, Inc.'s ("AIIC") motion for summary judgment, ECF No. 35. For the reasons set forth below, the court grants the motion.

## I.  BACKGROUND

This case arises out of a dispute over two insurance policies. From October 27, 2015 to October 27, 2016, Weeks & Irvine LLC ("Weeks") held a Lawyers Professional Liability Insurance Policy with AIIC (the "2015–2016 Policy"). On or around September 16, 2016, Weeks submitted an application for renewal of its professional liability insurance with AIIC. AIIC renewed the policy with effective dates of October 27, 2016 to October 27, 2017 (the "2016–2017 Policy"). In short, this coverage dispute results from an insured committing and failing to report a mistake during the former policy period and seeking coverage for the resulting claim during the latter policy period.

In March 2016, Prairie Son Properties LLC ("Prairie Son"), the original plaintiff in this matter, hired Weeks to handle the closing of a $400,000 loan from Prairie Son to Moss Construction of the Lowcountry, LLC ("Moss Construction"). Weeks was insured

by AIIC during this time.  To secure the loan, Moss Construction issued a mortgage to Prairie Son on a property in Beaufort County, South Carolina (the "Property").  Under the terms of this agreement, Prairie Son would be in first lien position on the Property.

On March 11, 2016, Weeks closed the loan and the funds were disbursed by Prairie Son to Moss Construction.  Weeks alleges that it promptly sent the mortgage and filing fee to the Beaufort County Register of Deeds but that instead of being filed, the mortgage was returned to Weeks because the payment exceeded the fee required for recording.  By the time Weeks resubmitted the mortgage for filing with the correct fee and had the recording perfected on May 23, 2016—over 70 days after the closing—three additional mortgages on the Property had been recorded.  As a result, the Prairie Son mortgage had fourth priority on the Property.

Weeks alleges that on August 1, 2016, it discovered that the Prairie Son mortgage was in fourth priority, not first.  ECF No. 41-2.  Weeks claims that it discussed the issue with Prairie Son's attorney, who Weeks believed had come to an agreement with the intervening mortgagees to subordinate their superior-priority mortgages to Prairie Son's mortgage (the "Subordination Agreement").  The Subordination Agreement, Weeks believed, would put Prairie Son back in first priority position.   ECF No. 41-3; ECF No. 41-16, Weeks Aff. ¶ 7.

On or about September 16, 2016, Weeks submitted an application for renewal of its professional liability insurance with AIIC (the "Renewal Application").   Question 35 of the Renewal Application asked whether Weeks was "aware of any fact, circumstance, incident, error, situation or accident that may result in a claim."  ECF No. 35-3 at 4. Weeks answered "no" to this question and now claims that it did so because at the time it

submitted the application, it believed that the Subordination Agreement had resolved any potential issues from the Prairie Son case that could potentially result in a claim.

Weeks states that it learned in November 2016 that the Subordination Agreement fell through after Moss Construction declared bankruptcy. On November 23, 2016, Weeks contacted its insurance agent and advised him that there was an incident that needed to be reported, which may or may not turn into a claim. ECF No. 41-5. The insurance agent advised that Weeks would need to file a Supplemental Claim Application, which Weeks received from the agent on November 28, 2016, with instructions to complete it and "email it back to us [and] we will get the matter reported to Am Trust and then they will assign a claims representative and will contact you." ECF No. 41-6. Weeks completed the form and emailed it to its insurance agent on December 9, 2016. ECF No. 41-7; ECF No. 41-8.

On December 16, 2016, Prairie Son's attorney sent Weeks a demand letter in connection with the loss of mortgage priority ("December 2016 Demand Letter"). ECF No. 35-5. This letter stated that Prairie Son "understand[s] from our discussions that [Weeks] has placed its professional liability insurance carrier on notice of this claim [and] hereby demands that the principal be paid and made whole at this time." Id. Prairie Son's letter demanded "that the principal be paid in the amount of $400,000.00, accrued interest in the amount of $23,333.31, accrued late charges in the amount of $1,166.66, attorney's fees in the amount of $10,340.00, for a total of $434,839.97, as of December 15, 2016." Id. Weeks did not provide the December 2016 Demand Letter to AIIC, because, Weeks claims, AIIC had not responded to Weeks' submission of the

Supplemental Claim Application and had not requested any documentation regarding the potential claim.

On September 28, 2017, Prairie Son filed suit against Weeks, at which point Weeks submitted the claim to AIIC (the "Prairie Son Claim"). In November 2017, AIIC agreed to provide a defense to the underlying suit under a reservation of rights. On November 30, 2017, Weeks received another demand letter from Prairie Son, which it forwarded to AIIC along with a copy of the December 2016 Demand Letter. In January 2018, AIIC denied coverage for Weeks in the underlying suit, asserting that "there is no coverage under the Associated Policy for the [Prairie Son] Lawsuit, given that the Insured had knowledge of the Wrongful Act prior to the inception Date of the Policy." ECF No. 41-12.

On April 4, 2018, then third-party plaintiff Weeks filed a third-party complaint against AIIC, seeking a declaratory judgment that AIIC must provide coverage under the policies and asserting causes of action for breach of contract and bad faith. ECF No. 25. On August 16, 2018, AIIC filed a motion for summary judgment. ECF No. 35. On September 17, 2108, Weeks filed its response. ECF No. 41. On September 27, 2018, AIIC filed a reply. ECF No. 45. On October 1, 2018, the parties filed a consent stipulation of partial dismissal of all claims among and between Prairie Son, Weeks, and Stewart Title Guaranty Company; this stipulation realigned the parties such that third-party plaintiff Weeks became the only plaintiff, and third-party defendant AIIC became the only defendant. ECF No. 48. On December 12, 2018, the court held a hearing on the matter where the court dismissed Weeks's bad faith cause of action. On December 13,

2018, AIIC filed a sur-reply.  ECF No. 56.  On January 11, 2019, Weeks replied.  ECF

No. 58.  Thus, the motion has been fully briefed and is ripe for the court's review.

## II.  STANDARD

Summary judgment is appropriate if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that "there is no genuine dispute as to any

material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

P. 56(c).  "By its very terms, this standard provides that the mere existence of some

alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment; the requirement is that there be no genuine

issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

"Only disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment."  Id. at 248.  "[S]ummary

judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

Id.  "[A]t the summary judgment stage the judge's function is not himself to weigh the

evidence and determine the truth of the matter but to determine whether there is a

genuine issue for trial."  Id. at 249.  The court views the evidence in the light most

favorable to the non-moving party and draw all inferences in its favor.  Id. at 255.

"The party seeking summary judgment shoulders the initial burden of

demonstrating to the district court that there is no genuine issue of material fact."  Major

v. Greenville Hous. Auth., 2012 WL 3000680, at *1 (D.S.C. Apr. 11, 2012).

Nevertheless, "when a properly supported motion for summary judgment is made, the

adverse party 'must set forth specific facts showing that there is a genuine issue for

trial.'" Id. (quoting Fed. R. Civ. P. 56(e)).  The plain language of Federal Rule of Civil

Procedure 56(c) "mandates the entry of summary judgment, after adequate time for

discovery and upon motion, against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322

(1986).  "[C]onclusory allegations or denials, without more, are insufficient to preclude

the granting of the summary judgment motion."  Major, 2012 WL 2000680, at *1.

### III.  DISCUSSION

AIIC argues that summary judgment is warranted because the 2016–2017 Policy

does not extend coverage to the Prairie Son Claim as a matter of law.  AIIC denies that

coverage exists on two related grounds.  First, AIIC contends that Weeks' omission of its

mistake with respect to the Prairie Son mortgage in the Renewal Application precludes

coverage for the claim under the 2016–2017 Policy.  Alternatively, AIIC contends that

the terms of the 2016–2017 Policy do not extend coverage to the Prairie Son Claim

because Weeks had knowledge of the claim's underlying "wrongful act" prior to the

policy's inception date.[1]  Because the court agrees with AIIC's latter argument, summary

judgment is appropriate.  The court discusses each argument in turn.

### A.  Exclusion of Coverage Based on the Renewal Application

Weeks submitted the Renewal Application on September 16, 2016, seeking

coverage for the following year.  ECF No. 35-3.  Question 35 of the application asked

---

[1] In its motion, AIIC also argued that the 2016–2017 policy was subject to
rescission based on Weeks' omission of the alleged "wrongful act" in the Renewal
Application.  In its reply to Weeks' response, however, AIIC "with[drew] its argument on
summary judgment on rescission."  ECF No. 45 at 1 n.1.

Weeks if it was "aware of any fact, circumstance, incident, error, situation, or accident that may result in a claim being made against the firm." Id. at 4. Weeks responded "No." Id. AIIC subsequently issued the 2016–2017 Policy to Weeks, under which Weeks now seeks coverage for the Prairie Son Claim. AIIC argues that it does not owe coverage to Weeks for the Prairie Son Claim because Weeks made a misrepresentation on its Renewal Application. As AIIC points out, the 2016–2017 Policy states: "[i]f any of the statements, representations or information in the Application are not true and accurate, there shall be no coverage for any Claim under this Policy with respect to any Insured Person who knew . . . of such information that was not truthfully and accurately disclosed in the Application." ECF No. 35-9 at 23–24.

In response, Weeks argues that its answer on the Renewal Application was true and accurate because of the words "may result in a claim being made against the firm." ECF No. 35-3 at 4 (emphasis added). According to Weeks, in September 2016, when it submitted the Renewal Application, it did not believe that its mistake would result in Prairie Son bringing a claim against it. Weeks contends that it held this belief because, at that time, the Subordination Agreement was going to put Prairie Son back into first priority position, thus remedying Weeks' recording mistake.[2] Therefore, according to

---

[2] The only evidence that Weeks has submitted of this Subordination Agreement is a December 8, 2016 email from Robbie Irvine to Mark Weeks, which states that "As I understand it, there were no claims made on either policy initially because Mr. Qualey had the 2 smaller mortgages negotiated to subordinate or release and the property was under contract to be sold. It now appears that contract fell through and Mr. Qualey is no longer on this case." ECF No. 41-3. This is an email sent not in August when the Subordination Agreement allegedly occurred, but four months later in December, around the time when Weeks submitted notification of a potential claim to its insurer AIIC. This email communication is between two partners of Weeks and does not include the other mortgagees allegedly involved in the Subordination Agreement. However, viewing the

Weeks, when it submitted the Renewal Application, it did not believe that its mistake would result in a claim and thus did not disclose it. In November 2016, when Weeks learned that something was wrong with the Subordination Agreement, it contends, it concluded that a claim may result from its mistake and notified AIIC.

Whether Weeks made a misrepresentation on the Renewal Application requires a factual determination. If Weeks did not believe that its recording error "may [have] result[ed] in a claim," then its "no" response to Question 35 of the Renewal Application was truthful, and coverage is not precluded. If Weeks' belief was not genuine, and it hid its "wrongful act" from AIIC to prevent higher premium costs, as AIIC contends, then coverage for the Prairie Son Claim would be precluded. This is an issue of fact that implicates credibility determinations. As such, it is within the sole purview of the factfinder. See United States v. Burgos, 94 F.3d 849, 868 (4th Cir. 1996) ("Determining credibility of witnesses and resolving conflicting testimony falls within the province of the factfinder . . . ."). Therefore, summary judgment on this ground is inappropriate.

Moreover, analysis of this issue under South Carolina insurance law, rather than the terms of the 2016–2017 Policy, leads the court to the same conclusion. In South Carolina, an insurer may decline to provide coverage under an insurance policy if it can demonstrate that:

> (1) the insured made a false statement in the insurance application; (2) that the insured knew was false when made; (3) that was material to the risk covered in the policy; (4) that the insurer relied on; and (5) that was made with the intent to deceive.

---

evidence in a light most favorable to Weeks, the court will assume that Weeks did rely on the Subordination Agreement when it filled out and submitted the Renewal Application.

Scottsdale Ins. Co. v. Collins, 2012 WL 2389976, at *3–4 (D.S.C. June 25, 2012) (citing

Gasque v. Voyager Life Ins. Co. of S.C., 344 S.E.2d 182, 184 (Ct. App. 1986)).

Normally, "whether a misstatement of fact in the application was made with the intent to

deceive and defraud the insurer is a question for determination by the jury." Id. (internal

quotations omitted). Yet a court may infer an intent to deceive "when there is no other

reasonable or plausible explanation for the applicant's faulty representation." Floyd v.

Ohio Gen. Ins. Co., 701 F. Supp. 1177, 1190 (D.S.C. 1988).

Here, the court cannot conclude that Weeks made a false statement with the intent

to deceive. Weeks has put forth a plausible and reasonable explanation for why it

thought that the mortgage issue did not warrant disclosure as an incident that "may result

in a claim." Weeks has presented evidence that its reliance on the Subordination

Agreement led to a reasonable relief that its mistake would not ripen into a claim.

Viewing the facts in a light most favorable to Weeks, the court cannot conclude that

Weeks' belief was unreasonable or disingenuous. Therefore, either legal avenue leads the

court to the same issue of fact that must be reserved for the jury's consideration. As

such, summary judgment is inappropriate on this ground.

**B. Coverage Under the Terms of the 2016–2017 Policy**

AIIC also argues that coverage does not extend to the Prairie Son Claim under the

terms of the 2016–2017 Policy because Weeks had knowledge of the underlying

"wrongful act" prior to the inception date of the 2016–2017 Policy. Because the court

must interpret unambiguous insurance policy provisions according to their plain and

ordinary meaning, the court agrees with AIIC.

Under the insuring agreement of the 2016–2017 Policy (the "Insuring Agreement")[3]:

> [AIIC] shall pay Damages and Claim Expenses . . . that the Insured shall become legally obligated to pay as a result of a Claim made against the Insured for a Wrongful Act, provided that . . . (ii) the Insured has no knowledge of such Wrongful Act prior to the Inception Date of this Policy . . . .

ECF No. 35-9, 2016–2017 Policy, ¶ I.A. "Wrongful act" is a defined term in the 2016–2017 Policy:

> "Wrongful Act" means any <u>actual or alleged negligent act, error, or omission</u> committed or attempted in the rendering or failing to render Professional Services by any Insured on behalf of the Named Insured, including but not limited to Personal Injury.

Id. at ¶ II.BB. (emphasis added).

Most of the facts material to the court's analysis of this issue are undisputed. To the extent that the facts critical to this analysis are disputed, the court views them in a light most favorable to Weeks. Weeks failed to properly record the Prairie Son mortgage for a period of almost three months, resulting in the loss of Prairie Son's priority position. Weeks had knowledge of this mistake on August 1, 2016, before the Policy's inception date of October 27, 2017.[4] Between the time that Weeks gained knowledge of its mistake and the inception date of the 2016–2017 Policy, Weeks believed that the Subordination Agreement would neutralize its mistake because the agreement would put Prairie Son back into first priority position by subordinating the three intervening

---

[3] An insuring agreement creates the coverage in an insurance policy by defining "the subject matter and the contingency insured against." 44 C.J.S. Insurance § 502.

[4] The court refers to Weeks' recording error as a "mistake" because there is no dispute that Weeks' failure to properly record the Prairie Mortgage was a "mistake." The dispute here is whether that "mistake rises" to the level of a "wrongful act" such that coverage does not extend to the Prairie Son Claim.

mortgages.  After the 2016–2017 Policy commenced, Weeks learned that the Subordination Agreement fell through and reported the recording mistake to AIIC.

As such, the question before the court is a legal one.  Was Weeks' failure to properly record the mortgage during the pendency of the Subordination Agreement and before the inception date of the 2016–2017 Policy a "wrongful act" as defined by the 2016–2017 Policy, such that coverage does not extend to the Prairie Son Claim?  AIIC contends that Weeks' recording error was such a "wrongful act."  Meanwhile, Weeks contends that its recording error was not a "wrongful act" because the Subordination Agreement neutralized its mistake and supported its reasonable belief that a claim would not arise therefrom.  It would be absurd, Weeks argues, for an insured to be required to report every mistake it makes to its insurer, even where the insured believes that no claim could arise from that mistake.  Conversely, AIIC contends that an insurer would not be able to accurately assess the risk involved for a given policy if a potential insured could shield its previously committed negligent acts, thereby lowering its premium despite a risk known only to the proposed insured.  Based on the unambiguous terms of the 2016–2017 Policy, the court must conclude that Weeks' recording error was a "wrongful act" such that the policy does not extend coverage to the Prairie Son Claim.

"An insurance policy is a contract between the insured and the insurance company, and the terms of the policy are to be construed according to contract law." Auto Owners Ins. Co. v. Rollison, 663 S.E.2d 484, 487 (S.C. 2008).  "The cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language."  Beaufort Cty. Sch. Dist. v. United Nat. Ins. Co., 709 S.E.2d 85, 90 (S.C. Court App. 2011) (citing Schulmeyer v. State Farm Fire & Cas.

Co., 579 S.E.2d 132, 134 (S.C. 2003)).  "If the contract's language is clear and unambiguous, the language alone, understood in its plain, ordinary, and popular sense, determines the contract's force and effect."  Id. (citing Schulmeyer, 579 S.E.2d at 134).  "However, an insurance contract which is 'in any respect ambiguous or capable of two meanings must be construed in favor of the insured.'"  Id. (quoting Reynolds v. Wabash Life Ins. Co., 161 S.E.2d 168, 169 (S.C. 1968)).

The court finds that Weeks' failure to properly record the Prairie Son mortgage was a "negligent act, error, or omission" and thus a "wrongful act" based on the plain meaning of those terms.  Black's Law Dictionary defines "negligent act" as "an act that creates an unreasonable risk of harm to another."  ACT, Black's Law Dictionary (11th ed. 2019).  The ordinary meaning of negligence is similarly intuitive:  "[l]ack of attention to what ought to be done; failure to take proper or necessary care of a thing or person; lack of necessary or reasonable care in doing something; carelessness."  NEGLIGENCE, Oxford English Dictionary (3rd ed. 2005).  Weeks' mistake clearly fits squarely within the plain meaning of "wrongful act" as defined by the policy.  Weeks failed to properly record the Prairie Son Mortgage for 74 days after overseeing the transaction's closing, a mistake that resulted in Prairie Son losing priority position for its mortgage and, in turn, its ability to collect upon default of its loan.  Indeed, Weeks' own briefing repeatedly refers to that failure as a "mistake."[5]  Even viewing the facts in a light most favorable to Weeks, the court must conclude that its admitted "mistake" was a "negligent act, error, or

---

[5] See, e.g., ECF No. 41 at 7 (". . . Weeks & Irvine had continuous coverage with AIIC at all times, at the time of the mistake as well as the time of the claim.") (emphasis added).

omission" and thus a "wrongful act" for the purposes of the 2016–2017 Policy.  No other interpretation would be reasonable.

Weeks argues that its mistake was not a "wrongful act" because there was no threat of a claim ripening therefrom before the inception date of the 2016–2017 Policy. However, nothing in the 2016–2017 Policy gives the court a reasonable basis to conclude that a "wrongful act" must be coupled with the insured's belief that a claim may arise therefrom.  Such a construction would be an unreasonable interpretation of the ordinary meaning of the terms "wrongful act" and "negligent act, error, or omission."  Therefore, even assuming there was no threat of litigation prior to the inception date of the 2016– 2017 Policy, Weeks' failure to properly record the Prairie Son mortgage was a "wrongful act."  Because Weeks undisputedly had knowledge of that "wrongful act" prior to the inception date of the 2016–2017 Policy, the policy does not extend coverage to the Prairie Son Claim.

Other courts have similarly found that a "wrongful act" does not require the insured's belief that a claim may arise therefrom.  In Cement & Concrete Workers Dist. Council Pension Fund v. Ulico Cas. Co., the Second Circuit explicitly rejected the theory that a "wrongful act" required of the threat of a claim.  199 F. App'x 29 (2d Cir. 2006). There, the court considered an exclusion to an insurance policy that excluded claims where the insured had knowledge of the underlying "wrongful act" before the inception date of the policy.  Like Weeks' position here, the insured in that case argued that his mistake was not a "wrongful act" prior to the policy's inception date date because liability could not have flowed from the act until after the policy commenced. Considering that argument, the Second Circuit stated:

> We reject the [insured]'s argument that the prior-knowledge exclusion applies only when the [insured] had prior knowledge not simply that it had committed a wrongful act, but also that it would face liability for that act. The [insured] concedes that the exclusion's plain language requires only knowledge of a "wrongful act," but takes the position that an act cannot be "wrongful" as defined by the Policy until liability flows from it. There is no support for this tortured reading in the Policy itself. . . . We see no ambiguity in the meaning of the prior-knowledge exclusion that would defeat summary judgment.

Id. at 32.

Considering a similar dispute between insurer and insured, the district court in Mut. Real Estate Holdings, LLC v. Houston Cas. Co. reached a conclusion similar to the Second Circuit's. 2011 U.S. Dist. LEXIS 100072 (D.S.C. July 1, 2010). There, the court considered a "prior knowledge" provision of an insuring agreement nearly identical to the one in this case, which required that "the Insured ha[ve] no knowledge of such Wrongful Act prior to the Inception Date of this Policy." Id. at *5. There, the policy defined "wrongful act" as "any actual or alleged negligent act, error or omission . . . .", also mirroring the 2016–2017 Policy. Id. at *6. Considering the insured's argument that a "wrongful act" required the possibility that a legitimate claim might stem therefrom, the court found that "[the insured] is flatly incorrect to argue that the term 'Wrongful Act' may reasonably be construed[] . . . to exclude acts that, in the view of the insured, appear not to be actionable." Id. at 21; see also Fid. Nat. Title Ins. Co. v. Houston Cas. Co., 2012 WL 4523666, at *8 (M.D. Fla. Sept. 30, 2012) (finding no coverage where an insured made a claim during the policy period but had knowledge of the underlying wrongful act prior to the policy's inception date and the policy included a prior knowledge provision).

The court agrees with the logic and holdings of those courts and similarly finds that a "wrongful act" for the purposes of the 2016–2017 Policy does not require the threat of a claim. Therefore, Weeks' mistake was a "wrongful act" under the terms of the 2016–2017 Policy. Thus, the 2016–2017 Policy does not extend coverage to the Prairie Son Claim because Weeks had knowledge of the underlying "wrongful act" prior to the policy's inception date.

### C. The Split Retroactive Date Endorsement

However, the court's inquiry does not end there. The 2016–2017 Policy includes an endorsement that extends coverage by changing the retroactive date for "wrongful acts" covered by the policy (the "Split Retroactive Date Endorsement"):

> The liability of the Company for all Claims Expenses and Damages for each Claim made against the Insured for a Wrongful Act and the Retroactive Date of the Declarations is revised as follows:
>
> [The retroactive date is listed as 10/27/2012].

ECF No. 35-9 at 38. In other words, while the Insuring Agreement covers claims that arise from "wrongful acts" that occurred during the policy period, the Split Retroactive Date Endorsement extends that time period backwards, covering claims that arise from "wrongful acts" that occurred as far back as October 27, 2012.

In opposition to summary judgment, Weeks asserts two arguments with respect to the Split Retroactive Date Endorsement. First, it argues that the Split Retroactive Date Endorsement conflicts with the prior-knowledge provision of the Insuring Agreement and the court must resolve that conflict in favor of coverage. Second, it argues that the prior-knowledge provision of the Insuring Agreement renders the coverage provided by the

15

Split Retroactive Date Endorsement illusory. The court addresses each argument in turn, finding that neither justify coverage.

First, Weeks asserts that the "[Split] Retroactive Date Endorsement creates a fundamental inconsistency with the policy" because "[w]hile the insuring agreement purports to exclude coverage for a claim if the insured was aware of the wrongful act before the policy inception, the [Split] Retroactive Date Endorsement[] imposes no such limitation on the policy." ECF No. 41 at 8. The court disagrees.

Under South Carolina law, "if the language, words[,] and punctuation of the policy when considered as a whole give rise to a patent ambiguity, or are capable of two or more reasonable interpretations, at least one of which favors coverage, that construction which is most favorable to the insured must be adopted." Grayson v. Aetna Ins. Co., 308 F. Supp. 922, 926 (D.S.C. 1970); see also Pitts v. Glens Falls Indem. Co., 72 S.E.2d 174, 176 (S.C. 1952) ("Where the words of a policy are capable of two reasonable interpretations, the court will adopt the construction most favorable to the insured."). Where, however, the terms of a policy are unambiguous, the policy "must be construed according to the terms the parties have used." B.L.G. Enterprises, Inc. v. First Fin. Ins. Co., 514 S.E.2d 327, 330 (S.C. 1999). In that case, "[t]he court's duty is limited to the interpretation of the contract made by the parties themselves regardless of its wisdom or folly, apparent unreasonableness, or failure [of the parties] to guard their interests carefully." Id. (internal quotation marks omitted) (quoting C.A.N. Enterprises, Inc. v. S.C. Health & Human Servs. Fin. Comm'n, 373 S.E.2d 584, 587 (S.C. 1988).

The Split Retroactive Date Endorsement merely modifies the limits of coverage available depending on when an insured commits a "wrongful act" that underlies a claim.

The endorsement does not alter the requirements a claim must meet to receive coverage under the Insuring Agreement. Indeed, the Split Retroactive Date Endorsement explicitly states, "All other terms and conditions of this Policy remain unchanged." ECF No. 35-9 at 38. The only reasonable reading of the Split Retroactive Date Endorsement and the Insuring Agreement find the two provisions in harmony: the Split Retroactive Date Endorsement covers claims that arise from "wrongful acts" committed as far back as October 27, 2012, so long as the insured did not have knowledge of that wrongful act before the inception date of the 2016–2017 Policy. In other words, a claim must still comply with the terms of the Insuring Agreement to receive coverage, with or without the Split Retroactive Date Endorsement. Therefore, the court finds that the Insuring Agreement and the Split Retroactive Date Endorsement are complimentary, not conflicting. As such, the Retroactive Date Endorsement does not create an ambiguity in the 2016–2017 Policy.

Next, Weeks argues that if the Split Retroactive Date Endorsement is read in harmony with the terms of the Insuring Agreement, then the coverage it creates is so narrow that it is merely illusory. Again, the court disagrees. South Carolina recognizes the illusory coverage doctrine to protect insureds where the terms of the policy exclude from coverage "the very risk contemplated by the parties," rendering a policy provision "virtually meaningless." Isle of Palms Pest Control Co. v. Monticello Ins. Co., 459 S.E.2d 318, 321 (S.C. Ct. App. 1994), writ granted in part on other grounds, decision aff'd, 468 S.E.2d 304 (S.C. 1996); see also S.C. Farm Bureau Mut. Ins. Co. v. Kennedy, 730 S.E.2d 862, 867 (S.C. 2012) (explaining that "literal interpretation of policy language

17

will be rejected where its application would lead to unreasonable results and the definitions as written would be so narrow as to make coverage merely illusory").

The court cannot say that the Retroactive Date Endorsement provides coverage that is "virtually meaningless." So long as an insured is unaware of a prior "wrongful act," a claim that arises therefrom during the policy period would receive coverage. For example, if Weeks were not made aware of its failure to properly record the Prairie Son mortgage until after inception of the 2016–2017 Policy, the Split Retroactive Date Endorsement would cover the claim even though the wrongful act occurred prior to the policy's inception date. It's not hard for the court to imagine a scenario where a lawyer is negligent during one policy period but doesn't learn of her negligence until a subsequent policy period. Therefore, the court finds that the coverage provided by the Split Retroactive Date Endorsement was not illusory.

Relatedly, Weeks argues that the coverage provided by the Split Retroactive Date Endorsement is illusory because it creates an "unintended gap in coverage." ECF No. 41 at 12. In making this argument, Weeks relies on a case from the Southern District of Texas, OneBeacon Ins. Co. v. T. Wade Welch & Assocs., 2014 WL 2863701 (S.D. Tex. June 24, 2014), applying Texas law. As an initial matter, Weeks' argument is premised on Texas law. South Carolina has not recognized the "gap in coverage" doctrine recognized by the court in One Beacon. In this case, the court is bound to the law of this state and has no reason to believe that South Carolina would adopt such a doctrine.

More importantly though, One Beacon is easily distinguished from the instant case. There, as here, the court considered whether coverage extended to a claim that arose during one policy period from a wrongful act that occurred during a previous policy

period.  Under the terms of its policy during the first period, the insured in that case only had a duty to report a "wrongful act" that "may in the future give rise to a claim or suit." Id. at *10.  Additionally, its subsequent policy included a prior-knowledge provision similar to the one in the 2016–2017 Policy here.  The court concluded that a gap in coverage existed because the insured had no duty to report its "wrongful act" under the first policy but could not receive coverage for a claim based on that wrongful act under the second policy.  Id.  There is no comparable "gap" in the instant case because Weeks did have a duty to report its "wrongful act" during the policy period when the wrongful act occurred.

If Weeks had properly reported its "wrongful act" during the first policy period, there would be no gap in coverage.  Unlike the insured in One Beacon, Weeks maintained insurance through the same insurer, AIIC, during both the policy period in which the wrongful act occurred (2015–2016) and the policy period in which the claim arose (2016–2017).  Under the 2015–2016 Policy, an insured that properly reports a "wrongful act" ensures coverage for that act, even if the resulting claim is made after the policy period expires:

VII. NOTICE OF CIRCUMSTANCE/CLAIMS MADE EXTENSION

If during the Policy Period any Insured first becomes aware or has reasonable grounds to suspect that an Insured has committed or may have committed a specific Wrongful Act for which coverage is otherwise provided hereunder, and provided the Insured during the Policy Period gives notice to the Company of:

A. the specific Wrongful Act;
B. the injury or damage which has resulted or may result from such Wrongful Act; and
C. the circumstances by which the Insured first became aware of or suspected such Wrongful Act;

19

> then any Claim that may subsequently be made against any Insured
> arising out of such Wrongful Act shall be deemed for purposes of this
> insurance to have been made during the Policy Period.

ECF No. 35-8 at 21 (emphasis added).  Under this provision, if Weeks would have timely reported its recording error to AIIC when it learned of its mistake, it would have received coverage for the Prairie Son claim, even though the resulting claim arose after the inception date of the 2016–20-17 Policy.  The "gap in coverage" here was created by Weeks failure to properly report its "wrongful act," not by the terms of AIIC's policies.  Therefore, the doctrine applied by the court in One Beacon does not fit within the facts of this case.  Thus, the court rejects this argument.

At a hearing before the court, Weeks also argued that the Renewal Application conflicted with the Insuring Agreement of the 2016–2017 Policy because the Renewal Application did not include a prior-knowledge requirement and the Insuring Agreement does.  As such, Weeks contends, the conflict must be resolved in favor of coverage.  This argument is unpersuasive.  The court declines to insert ambiguity into the clear language of a policy based on questions an insurer asks in an application for coverage.  There is no conflict between a question that asks if an insured is aware of potential claims and a provision that requires an insured not have knowledge of prior "wrongful acts."  As AIIC correctly points out, and "insurer may ask questions simply to better underwrite or price the risk [covered by the policy] and not to determine what coverage to extend.  ECF No. 53-1 at 2.  Therefore, the court rejects this argument.

Based on the foregoing, the court finds that there are no genuine issues of material fact, and that coverage under the 2016–2017 Policy does not extend to the Prairie Son claim as a matter of law.  Therefore, summary judgment is appropriate.

## IV.   CONCLUSION

For the foregoing reasons the court **GRANTS** the motion for summary judgment.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**January 6, 2020**
**Charleston, South Carolina**